(C. D. 562)

Gruyere Cheese Corp. et al. *v.* United States

United States Customs Court, Third Division

(Decided December 1, 1941)

*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for the plaintiffs.
*Paul P. Rao,* Assistant Attorney General (*Joseph F. Donohue,* special attorney), for the defendant.

Before Cline and Keefe, Judges

Cline, Judge: These two suits were consolidated for trial. The merchandise involved was classified by the collector of customs at the port of New York as cheese and duty was assessed thereon at the rate of 35 per centum ad valorem under paragraph 710 of the Tariff Act of 1930. The plaintiffs claim that the merchandise is Gruyère process cheese dutiable at 5 cents per pound but not less than 20 per centum ad valorem by virtue of the trade agreement with Finland, published in T. D. 48554. The provisions involved read as follows:

Par. 710. [Tariff Act of 1930] Cheese and substitutes therefor, 7 cents per pound, but not less than 35 per centum ad valorem.

Par. 710 [Trade Agreement with Finland] Cheese having the eye formation characteristic of the Swiss or Emmenthaler type; and Gruyere process-cheese, 5¢ per lb. but not less than 20% ad val.

The merchandise covered by protest 35727–K is invoiced "135¢ Swiss Gruyère Cheese in cardboard boxes." One hundred and twenty-five cases of this cheese were returned for duty at 5 cents per pound or 20 per centum ad valorem, depending upon which rate was higher, but the merchandise in cases 3935–3944, invoiced as "10¢ contg. 72 boxes assorted" was assessed with duty at 35 per centum ad valorem.

The merchandise covered by protest 14791–K is invoiced as "950 cases of Swiss Gruyere cheese in boxes." The cheese in eight hundred of these cases, described on the invoice as "Crown Brand," was assessed with duty at 20 per centum ad valorem but the merchandise described on the invoice as "Trauben-Swiss," consisting of 150 cases in boxes of 8 ounces, 6 portions, was assessed at 35 per centum ad valorem.

The protests are directed against the classification of the cheese assessed at 35 per centum ad valorem. The merchandise was imported from Switzerland but the lower rates in duty in the trade agreement with Finland are applicable to the products of Switzerland if the merchandise is Gruyère process cheese.

The first witness called by the plaintiffs was Mr. Sven Holst-Knudsen, the treasurer of Gruyere Cheese Corporation, the plaintiff in protest 35727–K. He testified that he had been connected with the cheese business for 22 years, at first in Denmark, and he had done business with firms in Finland, Holland, Austria, France, Switzerland and various other countries; that he had been dealing in Gruyère process-cheese in this country for 12 or 14 years; that he had seen such cheese made in the Alpine factory in Berthoud, Switzerland, which is the factory which produced the merchandise in this case; that he had been importing the Gruyère process cheese for about 8 years; that the first four lots on the invoice (which consists of 125 cases) are plain Gruyère and the lot of 10 cases is assorted Gruyère cheese. In explaining the difference between the plain and the assorted cheese, the witness testified as follows:

Q. What is the difference between that assorted and the others which you speak of as plain Gruyere?—A. Well, the assorted boxes contain usually, in this case it contained 2 portions of plain Gruyere cheese and 4 portions of flavored Gruyere cheese, like, for instance, caraway or herbs, or something else, whatever it might be.

Q. Was the one portion of the herbs flavor?—A. At that time, yes, we have had that.

Q. At the time of this shipment?—A. Yes.

Q. And was the one portion of caraway?—A. Yes.

Q. Have you seen that cheese made in Switzerland?—A. I have.

Q. What is the caraway flavor?—A. Well, it is, the process of making the cheese is the same as when we make the plain process cheese; it is just that caraway seed is inserted in the cheese before it hardens.

Q. Sprinkled in the vat, is that it?—A. Yes.

Q. Now how about the herbs, what is that? What is the herbs in the Gruyere?—A. Well, that is sapsago.

Q. Do you know how that is put in?—A. I will say it is put in about the same way. I didn't watch every single variety being made. I just happened to spend a few hours in the factory watching them make the cheese.

Q. Have you seen them make the Gruyere process cheese very often?—A. In Denmark, yes.

On cross-examination the witness was asked how the caraway-flavored cheese was labeled and he said "that is labeled as caraway Swiss process cheese" and that the cheese flavored with herbs was labeled "Herbs Swiss Process-cheese." When asked what flavors were contained in the packages in the instant importation, the witness said:

A. Oh, there were 2 plain and 1 caraway and 1 herbs, and the other 2 I have no record of; it might have been ham; it might have been Stilton, or it might have been anything, but I know that from the very start we haven't had this assorted box very many years. We have always had herbs and caraway from the start, but I would say that other portions might have been Stilton and ham.

The next witness called by the plaintiffs was Mr. John Neurohr who has been connected with Kraft Phenix Cheese Corporation of New York for 16 years. He testified that it was his duty to check all imported cheese; that he opens a percentage of the boxes and inspects the contents. The witness produced a sample as representative of the cheese designated as "Trauben-Swiss" on the invoice covered by protest 14791–K and it was admitted in evidence and marked exhibit 1. He testified further that all cheese designated as Trauben-Swiss comes in with a label like that on exhibit 1 and that the Crown brand comes in with a similar label with a crown on it; that the statement on the face of exhibit 1 "Aged with Neuchatel wine" does not appear on the Crown brand; that the difference between the Crown brand and exhibit 1 is a slight taste of Neuchatel wine in the Trauben and the Crown has just a Swiss flavor and that there is a slight difference in color.

The next witness called by the plaintiffs was Mr. Edward Steele, the process foreman of the Kraft Phenix Cheese Corporation. He testified that he had processed Swiss Gruyère cheese in large quantities in the United States. When asked how it is processed, counsel for the defendant objected on the ground that the process may not be the same in the United States as in Switzerland and that the question was irrelevant. The objection was sustained. He testified further that cheese is flavored in various ways, as with caraway, chives or other similar herbs or materials and that he made Swiss Gruyère process cheese in this country.

The first witness called by the defendant was Mr. Frederick Rohner, the president of Gerber & Co., an importer of cheese from Switzerland,

who testified that he had seen Gruyère process cheese made in Switzerland and in France. When asked how it was made, he said:

A. Large loaves of Swiss cheese are cut in pieces, they are melted, an emulsifier is added, and then they go through packing machines into small forms, which are keg-lined, and they are then cut into small portions. The cheese is cut in small pieces, it is heated up to a certain degree, processed through the packing machines, and goes into small forms, is cooled off and put into small boxes, and sent off.

Judge KEEFE. By packing machines do you mean molding machines?

The WITNESS. Yes, sir; molding and packing are the same thing.

Q. And after the cheese is cut in form, is cut in small pieces, what is added to it before it is formed?—A. An emulsifier, sodium citrate.

Q. Is anything else added to it?—A. No.

Q. Now do you know the percentage of sodium citrate that is added?—A. Well, the total percentage of the emulsifier is not more than 3 per cent. How much of the sodium citrate is in the emulsifier I do not know.

Q. What else is contained in the emulsifier beside sodium citrate?—A. Water.

Q. Have you purchased cheese manufactured in that manner?—A. Yes, sir.

Q. How is it labeled?—A. It is labeled Swiss Gruyere or Swiss Process Cheese.

The witness was then asked if he had sold Gruyère process cheese in the United States and he stated that he had for the last 20 years. When asked what is the trade meaning of the term, counsel for the plaintiffs objected on the ground that the term "Swiss Process-Cheese" is descriptive of the method of production and not a trade term, and the objection was sustained with exception granted to counsel for the defendant. The witness testified further that he had sold process cheese flavored with herbs and caraway and that it was sold as "assorted package" and that assorted cheese is not sold as Gruyère process cheese.

The next witness called by the defendant was Mr. Otto Roethlisberger who is president of Roethlisberger & Co., an importer of cheese. He testified that he has been importing Gruyère process cheese ever since 1915 and selling it in wholesale quantities in the United States; that there is a definite and uniform trade understanding of the term "Gruyère Process-Cheese" in the United States. When asked what the meaning of the term was, counsel for the plaintiffs objected and the objection was sustained by the court with exception granted to the counsel for defendant. On cross-examination the witness testified that he had sold cheese like exhibit 1 with labels thereon as in the exhibit. In answer to a question from the court, the witness testified that the term "process" in connection with cheese means the mixing of cheese with another cheese of the same kind and with something else; that the finished product, both the plain and the flavored cheese, is made in the same size cakes or portions but there is a difference in flavor and color. The witness was asked and answered the following questions:

Q. Gruyere is the name of a town, isn't it?—A. Originally, that is where the cheese originated.

Q. The town where it originated?—A. Well, the name originated from that town. Gruyere originated from the town. It was called Gruyere, which is the center of the district where it was first made.

Q. Then processing is just the making of this cheese from some other cheese, is that it—the process of combining or grinding or melting, or something of that kind?—A. No, the process would be, processed gruyere cheese would be a gruyere cheese which is processed; it wouldn't be another cheese.

On further cross-examination the witness testified as follows:

X Q. There is no difference in the texture of exhibit 1 that you know of and which you have sold and the Crown Brand of the same importer which you also know, is there * * * ?—A. Not that I know of.

Judge CLINE. Do you know both of those brands?

The WITNESS. Yes.

X Q. There is a difference in the flavor because of the addition of the Neuchatel wine, is that true?—A. There is a difference in flavor. Why, I don't know.

At the conclusion of the evidence, counsel made the following statements:

Mr. BROOKS. I state for the information of the court that subsequent to the shipment involved in this Gruyere Cheese Corporation importation, the first protest on file, that the practice of the office of the United States Appraiser and of the Collector of Customs in classifying the entire box, consisting of 6 portions of assorted cheeses at 35 per cent, was changed, and that thereafter the Appraiser returned and the Collector assessed and classified the two single portions of the cheese in each box which were plain Gruyere, without any flavors added, at the 5 cents a pound or 20 per cent, under the Finnish treaty.

Mr. DONOHUE. I agree that Mr. Brooks has stated the practice correctly, but I don't agree that a statement of practice has anything to do with this case at all.

Exhibit 1 is a small flat circular box containing six portions of cheese. The label on the top thereof contains the words "Trauben Process-Swiss" and "Aged with Neuchatel Wine." The box contains another label on the side containing the words "Swiss Gruyere Process-Cheese."

No reference has been made by counsel for either party to a dictionary definition of process cheese. We find some statements relative thereto, however, in the Summary of Tariff Information of 1929 on pages 1066 and 1070, reading as follows:

CHEESE IN GENERAL. Description and uses. * * * In recent years a new industry in processed cheese has sprung up. The operation of processing is patented, there being several different processes. The process consists roughly of melting the cheese and adding other ingredients to restore its texture. While processed cheese may be made of cheese of any grade, processing permits the more advantageous marketing of the cheaper grades. Processing also facilitates putting up cheese in packages of convenient size for the retail trade.

Processed cheese.—The production of processed cheese in the United States is in the hands of a few large companies, one of which has a subsidiary in Canada. Statistics of production are not available. Imports of processed cheese consist of two varieties, one being Swiss "Gruyere," and the other processed cheese from Canada. The former is a Swiss cheese put up in small packages. It is without the eye formation characteristic of the Emmenthaler type and accordingly is not

affected by the change of duty of July 8, 1927. Some of the foreign cheeses imported and sold in small, fancy packages are, at least, indirectly competitive with the domestic processed cheese.

In a pamphlet issued by the United States Tariff Commission, dated 1936, having the title "Trade Agreement between the United States and Finland" and "Digests of Trade Data with Respect to Products on which Concessions were Granted by the United States," the following information appears on pages 55 and 56:

In the Trade Agreements with Switzerland and Finland that duties were reduced on "cheese having the eye formation characteristic of the Swiss or Emmenthaler type" and on "Gruyere process-cheese." The former designation includes chiefly Emmenthaler cheese * * * and is the same as that employed to designate chiefly Emmenthaler in the President's proclamation, effective July 8, 1927, increasing the duty as the result of an investigation under Section 315 of the Tariff Act of 1922.

Cheese processed from Emmenthaler is manufactured and sold in the United States as processed Swiss Cheese or Gruyere type Swiss process-cheese. In Europe similar cheese is usually known as "Petit-Gruyere cheese" or some similar designation involving the name Gruyere (rather than Emmenthaler)[2]; in order to comply with regulations of the Food and Drug Administration of the United States Department of Agriculture concerning the marking of processed cheeses, imports of cheese processed from Emmenthaler are marked either "Gruyere process-cheese" or "Process-Gruyere" or "Swiss process-cheese" or "Process Swiss cheese". The department accepts as a varietal designation of cheese processed from Emmenthaler either the word Gruyere, or the word Emmenthaler, or the word Swiss, making no distinction between them, but the processed cheese is rarely, if ever, marked "Emmenthaler process-cheese". Processed cheese has no "eyes" and is put up in small packages.

\* \* \* \* \* \* \*

In the manufacture of *processed Swiss cheese* in the United States, original Emmenthaler that is cracked, "blind", or otherwise deficient in appearance, together with some Emmenthaler of better quality, and perhaps small quantities of other types of cheese, is grated and then put through mixing and molding machines. Commercially, the processed product is quite distinct from the original cheese from which it is made; the appearance and texture of the cheese is altered, and because of the controlled blending of different grades of Emmenthaler, the quality and flavor is more uniform. Although the manufacture of processed Swiss cheese may have originated in order to salvage the lower qualities of Emmenthaler cheese, the product has acquired an independent and important market, due in part to the fact that it is packed in small, convenient packages which prevent its drying and make it convenient food to keep in the home.

*Imported Gruyere process-cheese* is made by blending various grades of Emmenthaler with a small percentage of loaf Gruyere cheese. The imported process-Gruyere, however, has a flavor quite different from that of domestic processed Swiss and commands a much higher price.

In the act of June 12, 1934, 48 Stat. 943, entitled "An Act To amend the Tariff Act of 1930," the President of the United States was authorized to enter into trade agreements with foreign countries and to pro-

---

[2] This apparent inaccuracy in appellation is due to the fact that a century or two ago when processed cheese was first made in Switzerland it was made chiefly from Gruyere cheese; although Emmenthaler long ago became the foundation of processed cheese, the latter has continued to be called in Europe "petit Gruyere", and in the United States simply "Gruyere."

claim modifications of existing duties, with restrictions, etc. Section 350 (a) (4) contains the following provisions:

SEC. 4 * * *; and before concluding such agreement the President shall seek information and advice with respect thereto from the United States Tariff Commission, the Departments of State, Agriculture, and Commerce and from such other sources as he may deem appropriate.

The above-quoted excerpts from the report of the United States Tariff Commission must be considered as having been before the President when he proclaimed the rates of duty applicable to Gruyère process cheese. It must be presumed also that when he made the proclamation he intended to establish rates of duty on imported cheese whether or not domestic cheese of the same character was the same or different. Any trade understanding in the United States as to what constitutes Gruyère process cheese would be immaterial in the determination of whether a foreign made cheese is within the provision in the trade agreement which by its very nature relates to goods produced in foreign countries. From the character of the testimony which the defendant in this case endeavored to introduce, it is evident that an attempt was made to limit, by commercial designation, the meaning of the words "Gruyere process-cheese" in the trade agreement with Finland. Such testimony is clearly immaterial. In any event, in the absence of a showing that there was a distinction between the common meaning and the trade meaning of the term, it was not acceptable. *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916.

The words "Gruyere process-cheese" in the trade agreement with Finland must be considered as a descriptive term as is the first part of the provision covering "cheese having the eye formation characteristic of the Swiss or Emmenthaler type." The use of the word "process" in connection with the word "cheese" indicates that the cheese described is made by a process of manufacture and not as an original production of cheese from milk. The defendant's witness Rohner described this process by stating that large loaves of Swiss cheese are cut in pieces, they are melted, an emulsifier is added, and then they go through packing or molding machines into small forms. Plaintiffs' witness Holst-Knudsen stated that the process of making the flavored cheese is the same as in making the plain cheese, the only difference being that caraway seed, herbs or other flavor are inserted in the cheese before it hardens. He testified further that the two portions of plain Gruyère in the boxes marked "assorted" on the invoice covered by protest 35727–K were the same as that in the 125 cases which the collector assessed at 5 cents per pound or 20 per centum ad valorem and that the only difference in the other 4 portions is that they are flavored. As to the merchandise assessed at 35 per centum ad valorem covered by protest 14791–K, which is represented

by exhibit 1, which has the name "Trauben Process-Swiss" and the words "Aged with Neuchatel Wine" on the box, plaintiffs' witness Neurohr testified that the only difference between the Crown brand (which was classified by the collector as Gruyère process cheese) and the "Trauben-Swiss" brand is that the latter showed a slight taste of Neuchatel wine and had a different color while the Crown brand has a Swiss flavor. Defendant's witness Roethlisberger testified that he did not know of any difference in the texture in the two brands. The only reference to the flavor of such cheese in the report of the United States Tariff Commission is that the imported product has a different flavor from the domestic.

From the description of Gruyère process cheese in both the Summary of Tariff Information of 1929 and in the pamphlet issued by the United States Tariff Commission in connection with the trade agreement with Finland, of which judicial notice may be taken, and the evidence in this case, we find that the cheese returned for duty at 35 per centum ad valorem by the collector is Gruyère process cheese within the common meaning of that term and we hold that it is dutiable at 5 cents per pound or 20 per centum ad valorem, whichever is higher, in accordance with the terms of the trade agreement with Finland. The protests are sustained. Judgment will be entered in favor of the plaintiffs.