(C. D. 767)

KRAFT PHENIX CHEESE CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 12, 1943)

*Brooks & Brooks* (*Frederick W. Brooks, Jr.*, of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: This is a suit against the United States in which the plaintiff seeks to recover a part of the duty assessed on certain cheese at the rate of 35 per centum ad valorem under paragraph 710 of the Tariff Act of 1930. The plaintiff claims that the merchandise is Gruyère process-cheese, dutiable at 5 cents per pound or 20 per centum ad valorem, whichever is higher, under paragraph 710 as modified by the trade agreement with Finland, T. D. 48554.

The pertinent parts of the competing provisions read as follows:

PAR. 710. [Tariff Act of 1930] Cheese and substitutes therefor, 7 cents per pound, but not less than 35 per centum ad valorem.

PAR. 710 [Trade agreement with Finland] Cheese having the eye formation characteristic of the Swiss or Emmenthaler type; and Gruyere process-cheese, 5¢ per lb., but not less than 20% ad val.

Twenty-one protests were consolidated for trial. The plaintiff introduced the record in *Gruyere Cheese Corp. et al.* v. *United States*, 7 Cust. Ct. 171, C. D. 562, and rested. We will not attempt to digest the evidence in that record as it is carefully set forth in the above-cited decision, which covered two grades of cheese, one designated as "Crown Brand, boxes assorted," and the other as "Trauben-Swiss."

The description of the merchandise on the invoices in the instant case is as follows: The tops of the invoices show the number of cases, after which follow the words "cases of Swiss Gruyère cheese in boxes." Under that appear the words "Crown Brand" and the details of those cases and then the words "Trauben-Swiss" followed by the details of that merchandise. The cheese described as "Crown Brand" was returned at 20 per centum ad valorem while that described as "Trauben-Swiss" was returned at 35 per centum ad valorem. That indicates that the "Trauben-Swiss" brand is the only commodity involved in this case. The record in the incorporated case covered both brands.

In that case the defendant attempted to introduce testimony showing the commercial meaning of the term "Gruyère process-cheese" but the court sustained an objection to such testimony made on the ground that the provision was a descriptive term. On this point, the court said in its decision:

* * *. From the character of the testimony which the defendant in this case endeavored to introduce, it is evident that an attempt was made to limit, by com-

mercial designation, the meaning of the words "Gruyère process-cheese" in the trade agreement with Finland. Such testimony is clearly immaterial. In any event, in the absence of a showing that there was a distinction between the common meaning and the trade meaning of the term, it was not acceptable. *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916..

The words "Gruyère process-cheese" in the trade agreement with Finland must be considered as a descriptive term as is the first part of the provision covering: "cheese having the eye formation characteristic of the Swiss or Emmenthaler type." The use of the word "process" in connection with the word "cheese" indicates that the cheese described is made by a process of manufacture and not as an original production of cheese from milk.

In the instant case the defendant again offered testimony regarding commercial designation of the term "Gruyère process-cheese" and the court reversed its ruling in the former case and admitted it.

The first witness called by the defendant was Mr. Frederick Rohner, who is president of Gerber & Co., an importer and distributor of cheese. He testified that he had been engaged in the business of importing cheese for 22 years and had sold it all over the United States; that the term "process-cheese" has had a definite understanding in the trade within his experience; that he had seen Gruyère process-cheese made in Switzerland and in France and he described the method of making it as follows:

A. Swiss cheese is cut into small pieces, and those small pieces are put through a chopping and grinding machine, then reduced to a mealy consistency. Thereafter the cheese is put in a mixing machine, water is added, and an emulsifier, to a maximum of 3 percent. The cheese mass is thereafter thoroughly mixed and put into a so-called filling machine. The filling machine feeds the cheese into tinfoil-lined molds, and after these molds have been formed there are 6 of those little wedge-shaped portions sampled in a metal dish.

The labels are afterwards placed on each of those portions. The dishes are covered, and pass through a refrigeration installation. After they come out the cheese, which in the meantime has become firm, is taken from the metal dishes and put into cardboard containers, and is after that ready for the market or for consumption.

The witness testified further that such cheese is labeled "Swiss Gruyère process-cheese"; that he has had occasion to discuss the meaning of that term with buyers of the merchandise and that, prior to June 17, 1930, the meaning was the type of cheese he described; that he had not dealt in merchandise like exhibit 1 but is familiar with it. The witness was then asked and answered the following question:

Q. Now, within your experience, Mr. Rohner, is merchandise like Exhibit 1 sold as Gruyère Process-Cheese—A. It is not sold as Gruyère Process-Cheese.

The next witness called by the defendant was Mr. Robert Roethlisberger, who is vice president and treasurer of Roethlisberger & Co., an importer of cheese. He testified that he had been importing Gruyère process-cheese since 1915 and had seen it manufactured in

Switzerland at the factory of Roethlisberger & Son. He described the process of manufacture as follows:

A. The Swiss Cheese is processed by removing the rind, cutting it into pieces, and then it is ground and heated to the melting point. Then a small quantity of emulsifier and water are added, so as to make a homogeneous mass. This mass is poured into the forms, which have been lined with tinfoil, and that becomes automatically sealed, so as to keep it airtight. After it is sufficiently cooled it is packed in the round boxes that we know in this market.

The witness testified further that he had sold Gruyère process-cheese at wholesale throughout the United States and that he was acquainted with the name under which it was sold; that he had discussed the meaning of the term "Gruyère process-cheese" with buyers of that merchandise and, at and prior to June 17, 1930, there was a definite, uniform, and general trade understanding of the term; that the meaning was cheese processed the way he had described; that he had never imported cheese like exhibit 1 but had sold it for approximately 5 years or more in New York, Kentucky, Missouri, and Texas; that he had always sold it under the name "Trauben-Swiss"; that within his experience exhibit 1 was not known in the trade as "Gruyère process-cheese."

On cross-examination the witness testified that Mr. Otto Roethlisberger, who testified in the case the record of which is incorporated herein, is his brother and they are associated in business. Questions were read to him from his brother's testimony and he testified as follows:

X Q. Mr. Otto Roethlisberger testified in this case, at a previous hearing, in reference to the Trauben Brand Cheese that is Exhibit 1 in this case that you have just examined. He was asked the question, "Did you purchase that from the Kraft Phenix Co.?—A. We did."

"Q. And you sold it in the boxes and with the labels thereon, such as represented by the exhibit in this case?—A. Yes."

He was further asked, "There is no difference in the texture of Exhibit 1 that you know of and which you have sold and the Crown Brand of the same importer, which you also know?—A. Not that I know of."

Do you agree with that testimony?—A. Yes.

The following questions indicate the extent of his sales of the Trauben-Swiss brand:

X Q. Have you personally offered Exhibit 1 for sale in the wholesale markets of this country?—A. Yes.

X Q. Where?—A. Well, of course——

X Q. Personally, I mean.—A. By mail. That isn't personal, is it? Mostly when we sold this cheese it was because we had an order, we received an order for Trauben-Swiss. It is not our own importation. Consequently, we only sold it when we had demand for it, and picked it up from Kraft.

X Q. When you say that you received an order for Trauben-Swiss, Trauben is the name of the brand under which this is sold, is it not?—A. Yes, I suppose it is.

X Q. What is the brand under which you sell your cheese?—A. Tiger—Tiger Gruyère.

X Q. How does the trade ask for your cheese, as Tiger Brand?—A. They ask for Gruyère or for Tiger Gruyère, Tiger Brand; different ways.

X Q. Can you personally recall that you have offered this cheese, Exhibit 1, for sale in this country yourself?—A. What do you mean exactly, that I offered it?

X Q. Well, have you been on the road and carried a sample of that and offered it to the trade?—A. No.

X Q. Have you ever gone to any of the trade in the local markets and offered Exhibit 1 for sale?—A. We made no effort to make any sales, because it wasn't our merchandise. We simply filled the order when we had demand, as an accommodation to the customer.

The first witness called by the plaintiff in rebuttal was Mr. Kenneth Clapp, who is employed by the Kraft Cheese Co. He testified that he has been employed by that firm since 1928, and had been engaged in selling cheese for that organization from 1930 down to date and had traveled quite extensively in eastern United States; that he sees correspondence that comes in from throughout the country on bulk and imported cheese and that such sales have been under his jurisdiction since 1930; that Crown brand cheese is imported from the same source as exhibit 1; that the only difference is that a little Neuchatel wine is added to Trauben Gruyère for flavor; that it does not make any difference in the texture and he knows of no other difference; that he knows the term "Gruyère process-cheese" as used in the wholesale trade in the United States and that it means "a particular package of portion cheese made of genuine Emmenthaler cheese"; that the term includes both plain and flavored Gruyère; that exhibit 1 would be within the commercial understanding of the term "Gruyère process-cheese."

On cross-examination, the witness was asked if a buyer ordered Gruyère process-cheese how he would fill the order and he stated, "Well, I would first have to find out whether he wanted Trauben, Crown, or other type of Gruyère cheese." He was then asked the following question:

X Q. Well, I just want Gruyère Process-Cheese. How do you know how to fill that order with the kind of cheese?—A. I would give him plain Gruyère Process-cheese.

X Q. Plain Gruyère, without any flavoring of any kind?—A. If they asked for just Gruyère cheese.

X Q. And if they want Trauben or flavored they must specify that they want that, do they not?—A. Trauben is a brand name.

X Q. Yes, but that is specified, that indicates that they don't want plain Crown Gruyère Process-Cheese?—A. No, I wouldn't say that.

X Q. What do they want?—A. Trauben Gruyère, as the name indicates, is a wine-flavored Gruyère cheese.

X Q. That is right; and if I want Trauben and I just simply ask you for Gruyère I won't get Trauben, will I?—A. No, you won't.

The next witness called by the plaintiff was Mr. Sven Holst-Knudsen who, since 1919, had been an agent representing manu-

facturers of foreign cheese. He testified that he had sold Gruyère process-cheese throughout the United States and had personally visited all of the main cities in the entire country selling such cheese at wholesale; that he had known the term "Gruyère process-cheese" as used in this country for the last 15 years; that he had sold the plain Gruyère cheese as well as the flavored during that time; that he had not sold the brand represented by exhibit 1 but he had sold the Swiss Beauty brand which is almost identical with any other brand made in Switzerland but is made by a different factory from that making the Trauben brand; that he had sold a flavored Gruyère process-cheese under the Swiss Beauty brand and that the flavored cheese is known in the wholesale trade and commerce of the United States as Gruyère process-cheese.

On cross-examination the witness testified that if Gruyère process-cheese was ordered he would deliver Swiss Beauty Gruyère cheese which would not be flavored unless the order designated the flavor wanted, but the term "Gruyère process-cheese," standing alone, means such cheese without any flavor and that is the type he sold throughout the trade as Gruyère process-cheese.

On redirect examination the witness testified that the flavored cheese is sold as Gruyère process-cheese, assorted box, and that up to the time the war started, no business having been done since that time, it was sold under the name Gruyère process-cheese.

The next witness called by the plaintiff was Mr. Herman Eugene Bossart, who has been engaged in the cheese business for over 20 years. He testified that during the entire period of 20 years he had dealt in Gruyère process-cheese throughout the United States and sold such cheese; that he dealt in Gruyère process-cheese which is plain and also that which is flavored and for about 10 years he had been dealing in the Gruyère assortment; that he had never sold cheese like exhibit 1 but had met it in competition throughout the country and had seen it made in Switzerland; that in his estimation such cheese comes within the trade understanding of the term Gruyère process-cheese in this country and it is his information and knowledge of the trade designation "Gruyère process-cheese" that exhibit 1 would be included within it.

On cross-examination the witness was asked if a customer wanted Trauben-Swiss cheese and ordered only Gruyère process-cheese whether he would get Trauben-Swiss cheese and he answered that he would not unless he mentioned Trauben-Swiss cheese. He testified further that the term "Gruyère process-cheese" means cheese made from Gruyère or Emmenthaler cheese but if the customer wanted flavored cheese he would mention the flavoring and if he ordered just "Gruyère process-cheese" he would get it without the flavoring. The

witness testified also that he had not sold the cheese with the wine flavor in it.

In *Gruyere Cheese Corp. et al.* v. *United States, supra,* the court held that the Crown Brand cheese, boxes assorted, and the Traüben-Swiss brand, which were both flavored, were Gruyère process-cheese within the common meaning of that term, relying in part on the definitions in the Summary of Tariff Information of 1929 and the description of that merchandise in the "Digests of Trade Data with Respect to Products on which Concessions were Granted by the United States" which were before the President in connection with the trade agreement between the United States and Finland. Quotations from those publications are contained in our decision. In the instant case the defendant assumed the burden of proving that the Trauben-Swiss brand, herein involved, was not within the commercial meaning of the term "Gruyère process-cheese" as used in trade and commerce, at or prior to the enactment of the Tariff Act of 1930. The term was not used in that act but was inserted in the trade agreement with Finland in 1936.

A question arises as to whether or not the term used in the trade agreement is a commercial term, since the record upon which the President acted relates to the method of producing the cheese rather than the commercial meaning of the term. However, we do not deem it necessary to pass on that point since we are of opinion that the record in this case is not sufficient to establish a commercial designation different from the common meaning of the term. Two witnesses produced by the defendant testified that in trade and commerce Gruyère process-cheese means cheese made from Swiss or Emmenthaler cheese by a certain process, which they described. They did not mention the insertion of a flavor but they testified that the Trauben-Swiss brand did not fall within the commercial term. Three equally qualified witnesses, appearing in behalf of the plaintiff, testified that in trade and commerce of the United States the term includes the flavored Gruyère process-cheese. One of the witnesses for the defendant had never dealt in the Trauben-Swiss brand and two of the witnesses for the plaintiff had not dealt in it, although these two witnesses for the plaintiff had handled other brands of flavored Gruyère process-cheese. Such conflicting testimony does not establish a uniform, definite, and general trade understanding of the term "Gruyère process-cheese" different from the common meaning of that term. It appears to have been common among merchants to mention the brand when ordering cheese because one of the witnesses for the defendant stated that he received orders for "Tiger brand" or "Tiger Gruyère" and one of the witnesses for the plaintiff testified that the product he handled was the "Swiss Beauty brand."

The issue as to the proof of commercial designation in this case is much like that in *Downing* v. *United States*, 1 Ct. Cust. Appls. 500,. T. D. 31530, where the importers assumed the burden of proving that certain toilet soap, which was within the common meaning of the tariff term "fancy toilet soap," was not fancy toilet soap within the trade understanding. The importers produced a number of witnesses who testified that the merchandise was not within the term and the Government produced equally qualified witnesses who testified that it was within the commercial term. The court said at page 504:

As has been stated, each party called a large number of expert witnesses concerning the trade meaning of the words "fancy soap." The very fact that there is such hopeless confusion and irreconcilable difference between them argues against the existence of a commercial definition which was definite, uniform and general.

In the case of *United States* v. *New York Cordage Co.*, 18 C. C. P. A. (Customs) 23, T. D. 43977, there was a conflict in the testimony regarding the commercial meaning of the tariff provision for "Cordage." The court said at page 24:

The witnesses called by the Government testified, in substance, that the merchandise was twine, tarred; and that it was not known in the trade as cordage, but was bought and sold as marline and houseline. Some of these witnesses, and at least one of the witnesses called by the importer, testified that in the trade and commerce of the United States the term cordage was "limited to merchandise three-sixteenths of an inch in diameter and over." However, but one witness testified that the quoted commercial designation of cordage was definite, uniform, and general. *Under these circumstances, and in view of the fact that the evidence is conflicting, we must hold that commercial designation has not been established.* [Italics ours.]

In *United States* v. *M. Bernstein & Sons*, 19 C. C. P. A. (Customs) 59, T. D. 44895, one of the questions presented was whether the commercial testimony was sufficient to exclude dogskins from the term "furs or furs dressed on the skin." The testimony introduced was conflicting and the court held that commercial designation had not been established. The court said at page 63:

Assuming that proof of commercial designation was material, *the burden was upon appellee to establish by a preponderance of evidence that prior to September 21, 1922, in the fur trade and commerce of the United States, there was a definite, uniform, and general meaning of the phrase "furs dressed on the skin" different from its common meaning, and that such meaning excluded dogskins from such phrase.* Negative testimony of those engaged in such trade to the effect that in their trade and in their understanding dogskins were not excluded from the phrase "furs dressed on the skin" was competent evidence to rebut appellee's testimony that the meaning of said phrase claimed by it was definite, uniform, and general, and, if believed by the court, such evidence was sufficient to defeat appellee's claim of commercial designation. [Italics ours.]

There is no preponderance of evidence in the instant case tending to show that, adopting the language of the court in the above excerpt

from its decision, "there was a definite, uniform, and general meaning of the phrase * * * [Gruyère process-cheese] different from its common meaning." In fact the defendant produced no such testimony. In *Passaic Worsted Co. v. United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, the court said:

* * *. If, in the case at bar, it was sought to establish commercial designation of the imported machines as textile machinery, before attempting to do so it must be *legally admitted* that they have a commercial designation which differs from their common designation and that, under the common designation, they are not textile machinery. * * *. [Italics ours.]

It does not appear that it was "legally admitted" in the record in the instant case that the common meaning of the term "Gruyère process-cheese" differs from the commercial meaning. Hence, the proper foundation for proof of commercial designation was not laid.

The argument that the Trauber-Swiss brand of cheese is not dutiable as Gruyère process-cheese because the brand name is used in giving orders for the commodity is as well applicable to the Crown brand, the Tiger brand, and the Swiss Beauty brand because the names of those brands are also used in giving orders for the same.

We are not impressed with the contention of the defendant that, since orders for Gruyère process-cheese without other qualification would be filled with unflavored cheese, the only cheese of that description covered by the trade agreement is the unflavored variety. A somewhat similar contention was passed upon by the court in *Austin, Nichols & Co. v. United States*, 4 Ct. Cust. Appls. 261, T. D. 33483, which covered pickled capers. The importers produced testimony showing that commercially the goods were always ordered as "capers" and never under the word "pickles." The court held that the articles were within the class of merchandise known as "pickles." The court said:

Testimony was introduced by the importers to the effect that commercially the merchandise at bar always passes under the specific name of capers and never under the name of pickles. Upon this testimony, however, the board held that although the trade always calls the merchandise capers, nevertheless the name pickles, in common acceptation, generically includes articles possessing the characteristics of the capers in question, and that the testimony fell short of establishing a definite, uniform, and general trade meaning of the word pickles which would exclude the importation.

The court is of the opinion that this finding of the board is not contrary to the real meaning of the evidence contained in the record. It is clear that many articles belonging to well-known classes may nevertheless always pass in trade under more specific names, but this fact alone would not necessarily withdraw them for tariff purposes from the larger class to which the species may belong.

The board was justified in the conclusion that the present testimony does no more than disclose a case of that character. While the capers in question are invariably called capers, nevertheless they possess certain qualities and characteristics which bring them within the class of pickles. * * *.

Counsel for the defendant argues in his brief that the issue in this case is settled by the decision in *Lamont, Corliss & Co. et al. v. United States*, 16 Ct. Cust. Appls. 488, T. D. 43224. The issue in that case differs from that herein involved because here the imported merchandise is within the common meaning of the term "Gruyère process-cheese" and the defendant seeks to exclude it from that provision by testimony as to the commercial meaning of the term, while in that case the merchandise was not within the common meaning of the term "stearic acid" and the importers sought to have it classified as such by evidence showing that it was sold in the United States under that term. The importers' evidence showed that the imported merchandise was sold under the terms "imported stearic acid" and also as "stearol" and "stearine" and some of the sales of the importers' witnesses were comparatively small. The Government produced thirteen witnesses who were dealers in domestic stearic acid. They testified that the term "stearic acid" had a uniform, definite, and general meaning in the trade covering a commodity with definite characteristics, such as a limitation as to melting point and iodine value and a definite crystalline structure and was made from animal fats and that, as the imported product did not possess those characteristics, it was not the stearic acid of commerce. The trial court held that the importers had not met the burden cast upon them of establishing that the imported merchandise was definitely, uniformly, and generally known in the trade as stearic acid and the appellate court affirmed that finding.

The issue in the instant case is more like that in *Austin, Nichols & Co. v. United States, supra,* where the court held that pickled capers were dutiable under the provision for pickles although they were sold under the name capers. They were in the class of pickles although they were sold under specific names indicating the ingredients. In the instant case the merchandise is one of the classes of Gruyère process-cheese, particular varieties being ordered under the brand name of the variety desired.

We are of the opinion that Gruyère process-cheese in the trade agreement, *supra,* covers a class of merchandise made from Swiss or Emmenthaler cheese by a process of cutting, grinding, or melting such cheese and adding certain other products to produce the texture and flavor desired, after which it is poured into small individual molds and includes such cheese whether or not it is flavored. The protests are sustained and the merchandise is held dutiable at 5 cents per pound, but not less than 20 per centum ad valorem, under paragraph 710 of the trade agreement with Finland. Judgment will be entered in favor of the plaintiff.