(C. D. 832)

NIPPON CO. ET AL. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 11, 1944)

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks, Joseph E. Weil,* and *Robert C. O'Grady,* special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: In these suits against the United States, arising at the ports of Los Angeles, Calif., Seattle, Wash., and Portland, Oreg., the plaintiffs claim that the collector erred in classifying certain seaweeds under paragraph 775 of the Tariff Act of 1930 and assessing duty thereon at 35 per centum ad valorem. The plaintiffs' chief claim is that the merchandise is free of duty under paragraphs 1722 or 1705, but the protests contain alternative claims at 10 per centum ad valorem under paragraph 1540 and at 10 or 20 per centum ad valorem under paragraph 1558. The provisions of law involved read as follows:

PAR. 775. Vegetables (including horseradish), if cut, sliced, or otherwise reduced in size, or if reduced to flour, or if parched or roasted, or if pickled, or

packed in salt, brine, oil, or prepared or preserved in any other way and not specially provided for; * .* * 35 per centum ad valorem * * *.

PAR. 1540. Moss and sea grass, eelgrass, and seaweeds, if manufactured or dyed, 10 per centum ad valorem.

PAR. 1705. Kelp. [Free of duty]

PAR. 1722. Moss, seaweeds, and vegetable substances, crude or unmanufactured, not specially provided for. [Free of duty]

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Protest 998013–G contains an additional claim, reading:

Iriko and other dried fish, as contained in cases K1440 to K1444 inclusive assessed at 25 per cent under paragraph 719 (fish pickled or salted), are dutiable at 1¼ cents per pound, either under the same paragraph (fish in bulk), or under paragraph 717 (c) (dried fish).

Trials in the cases were held at the various ports of entry and also at San Francisco and New York.

The record contains testimony taken on protests filed against the collector's classification on entries at three different ports, namely, Los Angeles, Calif., Seattle, Wash., and Portland, Oreg., and relates to three groups of protests arising at the different ports. Samples were offered in evidence and testimony was introduced at each port and the cases were then transferred to San Francisco where the records in the three groups of cases were consolidated and further testimony introduced. Upon motion by counsel for the defendant the cases were transferred to New York where further testimony was taken, after which they were retransferred to San Francisco and submitted after a further hearing.

The first trial covered protests 987586–G, 985361–G, and 983208–G. The merchandise in those cases was entered in Los Angeles. At the trial at that port, samples of the commodities in issue were received in evidence. The following list indicates the exhibit numbers and the invoice descriptions of the articles represented thereby:

Exhibits 1 and 1–A—Asakusa nori
Exhibits 2 and 2–A—Motozori konbu
Exhibits 3 and 3–A—Oboro konbu
Exhibit 4—Ajitsuki nori

Protests 990373–G, 990370–G, and 990389–G were called for trial at Seattle, which was the port of entry of the merchandise in those cases, and testimony was offered at that port. Later protests 990370–G and 990389–G were placed on the suspended files of the court and therefore are not covered by this decision. The following exhibits were received in evidence:

Exhibit 1—Oboro konbu
Exhibit 2—Aoita konbu

Exhibit 3—Tororo konbu

Ill. exhibit 4—Atsuita konbu or shiroita konbu

At the trial at Portland two other cases on the same subject were set for hearing, namely, 988475–G and 998013–G and the following exhibits were introduced in evidence:

Exhibit 1—Tokusen ohban nori
Exhibit 2—Matsu ohban nori
Exhibit 3—Asakusa nori
Exhibit 4—Daishi konbu

The plaintiffs introduced considerable evidence in the different trials in an endeavor to prove a long-continued customs practice in classifying the merchandise under the provision for "seaweeds, * * * crude or unmanufactured" in the free list of different tariff acts prior to a change in classification to prepared vegetables under paragraph 775 of the Tariff Act of 1930 in November 1938. The record shows that, until November 1938, the customs authorities at Los Angeles, San Francisco, and Seattle passed like merchandise free of duty as "seaweeds, * * * crude or unmanufactured," but at Portland tokusen ohban nori, matsu ohban nori, daishi konbu, and oboro konbu were classified as "seaweeds, if manufactured or dyed" and duty was assessed thereon at 10 per centum ad valorem under paragraph 1540 of the Tariff Act of 1930 and similar provisions in the previous acts, and that asakusa nori was returned at 10 per centum ad valorem under paragraph 1540 and similar provisions in the previous acts until the promulgation of the decision in *K. Ishihara* v. *United States*, 61 Treas. Dec. 1654, Abstract 20146, when the practice was changed on that commodity to the free-list provision, but on all of the other kinds of merchandise the classification continued under paragraph 1540. Ajitsuki nori was classified by the customs officers at Portland as prepared vegetables under paragraph 775. Evidently the customs practice was not uniform at the different ports prior to November 1938 and therefore the reliance on long-continued customs practice fails

As there appears to be a distinction between nori and konbu, we will review the evidence on the two products separately.

The record contains the testimony of four witnesses showing how asakusa nori is produced. Their testimony is in substantial accord and it appears therefrom that in the late fall bamboo poles or branches from trees or bushes are set in the beds of streams where they empty into the ocean and where the tide ebbs and flows; that in about 2 or 3 months moss or seaweed gathers on the poles or branches and, in the month of March, it is gathered and brought to shore where it is cut in small pieces and put in tubs of fresh water to wash out the sand and shells; that the seaweed, which floats on the top of the water, is

then taken out of the tubs in large dippers and poured on screens to dry in the sun; that after about 5 hours the nori has dried in the form of sheets which are put in cans having a cover and kept in a cool room; that, when the sheets are thoroughly dry, about 10 sheets are placed in a package and the merchandise is ready for shipping. One of the witnesses testified that the seaweed is cut in pieces one-quarter of an inch in length before it is put in the tubs of fresh water for washing. The witnesses themselves had done this work prior to 1926, but one of the witnesses returned to Japan in 1937 and found that it was still made by the same process. Illustrative exhibits were received in evidence consisting of one photograph showing how the bamboo poles are planted in the stream, another showing how the nori is cut in pieces, and a third showing how it is dried in the sun. There is also a wooden frame and a reed screen on which the nori is dried and some plates on which pieces of the seaweed are attached. These exhibits were marked illustrative exhibits 5 to 8, protest 987586–G. Illustrative exhibit 6, which consists of seaweed pasted on cardboard, shows that the crude seaweed consists of leaves on a stem, the leaves being about 3 inches in length and about 1½ inches in width. Witness Torizawa testified that the pieces of seaweed taken from the poles in the water are slightly over a foot in length.

A number of the witnesses testified to the various names under which the nori is invoiced. It appears from the testimony that there is a district in Tokyo called "Asakusa," and nori coming from that district is called "asakusa nori." Witness Kitu Mattsu Togasaki testified that the same produce coming from western Japan is called "hori or hoshi nori" and that tokusen ohban nori and matsu ohban nori are the same as asakusa nori and that there are many different brands of nori which are all the same merchandise.

Witnesses Sadagoro Hoshizaki, Kiyo Torizawa, and Yasuda Hikokichi testified as to the use of asakusa nori. They stated that first it is roasted, then rice is wrapped into it and then it is in condition for eating; that sometimes it is broken in small pieces or powdered and scattered over rice for seasoning purposes and that it is also used in soup; that ajitsuki nori is prepared and seasoned and is eaten in the condition as it comes out of the cans, being dipped in prepared sauce before it is eaten; that the different brands of nori have always been the same in appearance, taste, and smell.

The merchandise invoiced as konbu or kombu appears to be a different product from nori. An examination of the exhibits shows that the konbu is in flat pieces. Exhibit 2 (aoita konbu) in Seattle protest 990373–G is about 4 inches in width and is folded up lengthwise so that the length cannot be determined. Some of the other exhibits of konbu, except the samples of oboro konbu and tororo konbu, are as wide as 6½ inches; others are narrower but all have

substantially the same appearance and are of a slate color. The exhibits of oboro konbu and tororo konbu are white in color and appear like shavings.

At the trial in Seattle, the plaintiffs called Mr. George B. Rigg who is a professor of botany in the University of Washington and a member of the staff on oceanography. He testified that he received a bachelor's degree at the University of Iowa and a degree of Doctor of Philosophy in botany at the University of Chicago; that he has been a member of the faculty of the University of Washington for 30 years and worked on oceanography at odd times; that from 1911 to 1913 he worked for the Bureau of Soils of the United States Government on the subject of kelps; that his work consisted of the collection and identification of seaweeds along the coast of Washington and the Shumagin Islands in Alaska. The witness was shown exhibit 2 (aoita konbu), protest 990373–G, and asked if he could identify it and he testified that it was dried kelp, that it had been folded up while it was wet, and then dried after it was folded.

Plaintiffs' witness Sadagoro Hoshizaki and defendant's witness Fong Mar translated the Japanese word "konbu" as meaning "kelp" in English.

Witnesses U. Higuchi, George Tsutakawa, H. T. Takami, and Kiku Mattsu Togasaki testified as to the method of producing the konbu exhibits. Witness Higuchi testified that he lived in Japan until 1913 and had returned to Japan three times since he came to the United States, the last time being in 1936, and at that time he traveled all over Japan; that exhibit 2 (protest 990373–G) is aoita kobu but some people use the word konbu; that the same type of material is called atsuita kobu, rijiri kobu, mitsuishi kobu and shiroita kobu; that he had seen aoita konbu made in Hoakaito, in the northern part of Japan; that he had seen it growing in the sea and drying on the beach and had seen it packed; that a man with a knife on a stick cuts the seaweed at the bottom in the water 10 or 15 feet down and then it is taken ashore and sun-dried on the beach, after which it is packed in bales of about 100 or 150 pounds and shipped to the center of Japan where it is repacked in 1- or 3-pound packages; that exhibit 1 (protest 990373–G) is oboro kobu made from shiroita kobu which is the same as aoita konbu; that shiroita kobu is originally brown in color and very thick, wide kobu; that oboro konbu is made from shiroita konbu by scraping; that originally shiroita konbu is a light brown color but after scraping it is white; that nothing has been done to it to make it white. Witness Tsutakawa said that oboro konbu and tororo konbu are made from shiroita konbu by shaving or scraping it; that shiroita konbu is the same as atsuita konbu and another name for it is daishi konbu; that shiroita konbu is soft when they

shave it and not as dry as exhibit 2, protest 990373–G (aoita konbu); that shiraga konbu is made by shredding shiroita konbu.

Witness Kiku Mattsu Togasaki testified that daishi konbu and motozori konbu are the same but one is narrower than the other; that the seaweed is from 4 to 10 feet long and merchandise made from the top, which is narrower, is called "daishi konbu" while that made from the rest of the seaweed is called "motozori konbu"; that "moto" means "wide."

The witnesses all testified that nothing is put on the konbu after it is harvested, and that it has always been the same in appearance, taste, smell, and use.

As to the use of the merchandise by the Japanese in the United States, the witnesses testified that the oboro konbu, tororo konbu, daishi konbu, and aoita konbu are used for making soup and that at New Year's time they made a dish called kobamaki in which some fish or something else is wrapped in aiota konbu like a jelly roll, and cooked.

On January 15, 1940, the court granted a written motion (filed with protest 990373–G) permitting Mr. Joseph V. Sample, a chemist in the customs laboratory of the appraiser at New York, to withdraw the samples in the Portland and Seattle protests for analysis, the initial protest numbers being 990373–G and 988475–G. The motion did not cover the samples in protest 987586–G, etc., which were introduced at Los Angeles. The court specified in its order that the portion of the exhibits not consumed in the analysis be returned for examination by the chemical laboratory at San Francisco, as requested in the plaintiffs' answer to the motion. Plaintiffs moved that portions of the same samples analyzed by the New York chemist be analyzed by a chemist in the customs laboratory in San Francisco, which motion was granted. The case was then transferred to New York.

At the trial in New York, Mr. Joseph V. Sample was called as a witness for the defendant. He testified that he is a chemist having 15 years of experience at the chemical laboratory in the appraiser's office in New York; that he received the samples marked exhibits 1, 2, 3, 4, and 4–A in protest 988475–G and exhibits 1, 2, 3, and illustrative exhibit 4 in protest 990373–G from the court and examined them for the purpose of determining whether or not they contained monosodium glutamate; that he obtained crystals out of the samples and determined by examination thereof by means of a microscope and polarized light that they were crystals of monosodium glutamate, sodium chloride, and traces of colloidal matter. The witness explained his method of examination in great detail. He testified further that monosodium glutamate does not occur naturally in seaweeds or any other products of nature; that it does not occur in sea

water, and is very soluble, so that if it were attached to the seaweed the sea water would naturally remove it; that it has a strong meaty flavor and is used extensively in the Far East as a condiment and is used to flavor seaweeds.

On cross-examination the witness testified that glutamic acid is formed in the hydrolysis of proteins which exist in vegetable and animal matter; that there is a process by which proteins break down and form glutamic acid, which has the same taste as monosodium glutamate; that glutamic acid is one of the amino acids; that they can occur by the treatment of a protein with acid, with alkali, or with a ferment enzyme; that decomposition to amino acid never occurs naturally; that some amino acids can be present with other matter in a partly decomposed or putrified substance of a protein character, but it could not have occurred naturally from the protein making up the seaweeds; that he started reporting to the collector the analysis of seaweeds in 1934 and he knew there was a ruling by the department on seaweeds in 1938 which directed that duty be assessed thereon; that he considered himself somewhat of an authority on the analysis of seaweeds and there has been no publication covering the combination of monosodium glutamate with seaweeds, except his own work which has been published for the benefit of the customs laboratories.

The next witness called by the defendant was Mr. Fong Mar who is a Chinese interpreter in the appraiser's office in New York. He testified that he had eaten merchandise similar to exhibit 1 in restaurants in New York; that it was used with rice or in soup. The witness translated the label on exhibit 2-A (protest 987586–G) as "Dashi Konbu" and the label on exhibit 4 (protest 987586–G) as "Agi Tuski Nori" and that there was other reading matter on the exhibit which meant "Taste added seaweed." On cross-examination the witness said that "agi" means taste but subsequently he said it means "net" as well as "taste" and the same character means "net weight"; that "Tsuki" means "attached to it"; that "Kombu" generally refers to a kind of seaweed which is of a large size and "Konbu" means "kelp."

The case was then transferred to San Francisco, but before the trial at San Francisco witness Sample was subjected to further cross-examination at New York which did not seriously weaken his testimony. He explained the examination of the samples in more detail than in his former testimony.

Upon application of counsel for the plaintiffs, the court ordered the appraiser at San Francisco to permit Mr. John D. Flintjer to take a portion of the samples examined by the chemist in New York. This order was marked exhibit 10, on the back of which appears a receipt signed by John D. Flintjer for the samples in protest 988475–G, etc. Apparently he did not receive the samples in protest 990373–G which were also examined by the chemist in New York.

The plaintiffs called Mr. Henry L. Alves who is the chemist in charge of the customs laboratory at San Francisco. He testified that he received portions of the samples which were analyzed in the chemical laboratory in New York and an analysis was made thereof by Mr. Joseph O. Broussard under the supervision of Mr. Alves; that he used the methods prescribed in publications 187 and 187-A issued by the Division of Laboratories of the Bureau of Customs and written by Mr. Joseph Sample, and he read that method into the record; that the result of the analysis showed that exhibits 1, 2, and 3, covered by protest 988475-G, contained added monosodium glutamate and exhibit 4 did not contain that substance, and that exhibits 1, 3, and 4, covered by protest 990373-G, contained added monosodium glutamate but exhibit 2 did not contain that substance.

The next witness called by the plaintiffs was Mr. John D. Flintjer, a chemist with an experience of 1 year. He testified that he had worked on seaweed for approximately 3 months and conducted experiments or tests on such merchandise; that he used the same methods which were used by Mr. Sample in making his analysis; that such methods were so simple that any chemist could use them; that he obtained samples from the appraiser's office in San Francisco of the exhibits in protest 988475-G and performed chemical tests on them. Without giving the details of the tests as testified to by the witness, it is sufficient to state that he said that he obtained crystals as a result of treating the samples but they were crystals of sodium chloride and not monosodium glutamate; that he identified them under a microscope and they were cuboid while crystals of monosodium glutamate are monoclinic. When asked if he could explain why he found no monosodium glutamate crystals in the exhibits while witness Joseph Sample did find them, he said:

The material is a considerable amount older than it was at that time, and during the time that it existed, it could have been that monosodium glutamate, if it had been present at one time in the seaweed, could have been knocked off, could have been lost by mechanical damage.

The witness testified further that efflorescence is "the exuding of salts from the internal structure of any tissue to the surface"; that efflorescence occurs when seaweed has been dried; that salts such as magnesium, calcium, sodium, and potash are exuded from seaweeds but they are loosely attached and might be brushed off in handling; that seaweed does not contain free glutamic acid; that he had delivered crystals of monosodium glutamate to Dr. Pabst. The witness was shown page 72 of the record in suit 3976 and testified that it related to a patent issued to a man named Ikeda regarding a method of obtaining salts of glutamic acid from the seaweed Laminaria japonica. The witness also read into the record an article by John E. S. Han relating to the presence of glutamic acid in seaweeds.

On cross-examination the witness testified that under certain optimum conditions glutâmic acid could exist·in seaweeds and that monosodium glutamate could exist naturally in seaweeds without being added but glutamic acid is not found in ordinary seaweeds in a free state. When asked to explain what he meant by optimum conditions, he said, "The acidity of the surrounding medium would have an influence on the existence or nonexistence of glutamic acid on seaweed."

The next witness called by the plaintiffs was Dr. Adolf Pabst who had studied fine arts at the University of Illinois and then, as a graduate student at the University of California, took a doctor's degree in 1928 in geology and chemistry, and most of the time since graduation has been on the staff of the University of California teaching crystallography. The attention of the witness was directed to the testimony of Dr. Alves when he read into the record article 187, issued by the Division of Laboratories of the Bureau of Customs, regarding the method of determining whether monosodium glutamate is contained in imported seaweeds, and heard it stated therein that crystals of such substance were orthorhombic. He testified that in an orthorhombic crystal the principal optical direction would correspond with the geometrical axis of the crystal and they would all be at right angles to each other, both the crystalline axis and the principal optical direction; that he had examined crystals of monosodium glutamate and found them to be monoclinic rather than orthorhombic; that the difference between monoclinic and orthorhombic crystals is minute and not conspicuous, but still is recognizable. When asked to explain the difference, the witness said:

In this particular case it so happens that the angles between certain faces, which in the case of orthorhombic crystals would be 90°, is about 82½°. When crystals are examined under the microscope such small differences are not easily detected, and some one just casually observing this material might call it orthorhombic.

\*　　\*　　\*　　\*　　\*　　\*　　\*

X Q. So your answer then in listening to the parts that he read to you would be that of themselves they might not be sufficient to determine the crystallization of monosodium glutamate?—A. No, and if I may answer, my objection is to the wording of this test, because the wording of the test is self-contradictory. It says they are orthorhombic, and also that they show octahedra and tetrahedra. Both things are not possible. If they are orthorhombic, they don't show octahedra and tetrahedra, and vice versa, so it is impossible to find anything at all which would answer that test. You can't get a substance which would answer that test.

Counsel for the plaintiffs read the statement of witness Sample as to the examination of the crystalline obtained from the exhibits, as follows:

I transferred this crystalline deposit, some of it, to a microscope slide, and placed that on the stage of a polarizing microscope alongside a slide containing

pure monosodium glutamate crystals. By manipulation of the stage, using polarized light, and by measuring the angles between corresponding faces of the crystals which were found to be anisotropic, their similarity to monosodium glutamate was established.

The witness was asked whether that represents an accurate way of determining whether a particular crystal is monoclinic or orthorhombic and the witness said:

A. It is not an accurate way of doing that, and in fact by mere comparison of one material with another, placing one next to the other without other observations referred to there, it would be impossible. Moreover, you can't determine whether a material is istropic or anisotropic from angle measurement described in that report.

Counsel read the record relating to witness Sample's testimony regarding a comparison of the crystals obtained from the imported merchandise with those in monosodium glutamate, as follows:

They have the same symmetry, the same general appearance; they belong to the same orthorhombic system; their nitrogen content was the same.

The witness was asked the following questions:

Q. * * *. Omitting the reference to nitrogen content, does that to you; that is if two crystals have the same general appearance, the same symmetry, is that enough to establish whether they are orthorhombic or monoclinic?—A. It is not. I will say for the benefit of the chemists who are here——

Judge KEEFE. The chemists are not interested.

The WITNESS. I will say for the benefit of the lawyers as well, that there are several thousand materials which would crystallize in the crystal classes involved, and the mere statement that two things crystallize in the same class is not sufficient evidence to identify a material.

Q. Is the fact that a crystal is anisotropic at all determinative of the question whether it is monosodium glutamate or not?—A. It is a necessary condition in order that it shall be called monosodium glutamate, but not a sufficient condition; in fact, not even one-tenth of one percent enough.

The question involved in this case with respect to the nori is what effect the flavoring substance has on the crude seaweeds. Does it turn it into a prepared vegetable, provided for in paragraph 775, or a manufactured seaweed, provided for in paragraph 1540, or is it still "seaweeds * * * crude or unmanufactured," provided for in paragraph 1722?

When the exhibits in protests 990373–G and 988475–G were examined in the customs laboratories in New York and San Francisco, the chemists found monosodium glutamate and sodium chloride in the nori. Monosodium glutamate, according to the testimony, is used for flavoring. The sodium chloride, or common salt, might have come from the sea water when the nori was dried, but, according to the testimony, the monosodium glutamate is not found in sea water or on seaweeds in their natural state. The chemist, Flintjer, who analyzed the exhibits in protest 988475–G, found sodium chloride

but failed to find any monosodium glutamate, but he admitted that as the samples were examined by the Government chemists some time prior to his examination, such crystals, if they had been present on the seaweeds, might have been brushed off. Dr. Pabst, who is evidently an authority on crystallography, testified that the method used by the Government chemists for determining whether the crystals obtained from the seaweeds were crystals of monosodium glutamate was faulty and not sufficient to identify the crystals as those of monosodium glutamate.

All of the Japanese witnesses testified that all of the nori products have the same taste, smell, and use they have always had. The witnesses who testified as to the manufacture of asakusa nori stated that nothing had been added to it, but their experience was prior to 1926 and possibly it may have been added in recent years. It evidently was not discovered in the merchandise by the Government chemists until about 1938.

The defendant argues that the seaweed was made into a prepared vegetable by the addition of monosodium glutamate which was found in the imported merchandise when it was analyzed. Counsel for the plaintiffs claim that the tests used by the Government chemists were faulty and would more likely indicate that the substance found was glutamic acid crystals or crystals of other amino acids and states that glutamic acid crystals are orthorhombic while monosodium glutamate crystals are not, and the chemist found that the crystals he extracted from the seaweeds were orthorhombic, which would indicate that the substance found was not monosodium glutamate. However, we are of opinion that the record is not sufficient to establish that the Government chemists did not find monosodium glutamate in the exhibits. That substance is merely a flavoring or a seasoning commodity and we are of opinion that its use would not cause the seaweeds to fall within the classification of prepared vegetables in paragraph 775. In *Gruyere Cheese Corp. et al.* v. *United States*, 7 Cust. Ct. 171, C. D. 562, and in *Kraft Phenix Cheese Corp.* v. *United States*, 10 Cust. Ct. 271, C. D. 767, the court held that flavored Gruyère process cheese was dutiable under the same provision as unflavored Gruyère process cheese. Under the same theory, why should flavored seaweeds be considered a substance other than seaweeds? The addition of monosodium glutamate might be sufficient to deprive the commodities of classification under paragraph 1722, as "seaweeds, * * * crude or unmanufactured," but it cannot operate as creating a new article out of the seaweeds to give it a new name, character, and use. The record shows that fresh nori as taken out of the ocean is used in Japan for the same purposes that the imported dried nori is used in the United States.

An examination of the authorities indicates that nori dried in the sun in sheets has been held to be free of duty by the courts under the

provision for crude seaweeds in the tariff acts of 1897, 1913, and 1922. *United States* v. *M. Furuya & Co.*, 176 Fed. 480, T. D. 30316; *United States* v. *Ohashi Importing Co.*, 7 Ct. Cust. Appls. 487, T. D. 37106; *United States* v. *Furuya & Co.*, 7 Ct. Cust. Appls. 495, T. D. 37109; *George S. Bush & Co.* v. *United States*, 36 Treas. Dec. 590, T. D. 38072, G. A. 8272; *K. Ishihara* v. *United States, supra.*

In the earlier decisions on nori in sheets, the court considered that the dried seaweeds which were held to be crude were in their natural form or structure. In *United States* v. *Furuya & Co.*, 7 Ct. Cust. Appls. 495, T. D. 37109, the court said at page 497:

\* \* \*. If the imported sheets be soaked in water the original leaves or shreds of seaweed will resume their former shapes, and, according to a witness, "You can see all the pieces as it comes from the beach; you can see this same identical thing as is here by going out on the beach."

We fail to find in the samples in evidence in this case any leaves like those in illustrative exhibit 6, protest 987586–G. There appears to be nothing but small pieces of leaves. The record in the instant case shows that the nori was cut in small pieces by knives after it was gathered from the ocean. Thus labor was performed on the product and the structure was changed by this process of manufacture. It was not made into a new article but it was changed from its crude or unmanufactured condition, which is sufficient to deprive it of classification under paragraph 1722.

The only case among those last above cited in which it appears that the leaves of the seaweeds were not in their natural form is *George S. Bush & Co.* v. *United States, supra.* It appears from that decision that the large leaves were broken up by beating or cutting with either wooden knives or sticks or steel implements, but the court followed the decisions of the appellate court and held that the merchandise was free of duty as "seaweeds, \* \* \* crude or unmanufactured" under paragraph 552 of the Tariff Act of 1913. The plaintiff's alternative claim at 10 per centum ad valorem, as "seaweeds, if manufactured or dyed" under paragraph 372, was overruled.

The defendant cites *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963, in an endeavor to establish that the merchandise herein involved cannot be classified under paragraph 1540. In that case a commodity called "nori tsukudani" was classified by the collector as prepared vegetables under paragraph 200 of the Tariff Act of 1913, and the importers claimed that it was dutiable as "seaweeds, if manufactured or dyed" under paragraph 372. The record consisted merely of an appraiser's report which stated that the merchandise was a Japanese food product consisting of the seaweed nori boiled with shoyu and packed in hermetically sealed tin cans. The court held that in order that merchandise should come within the provision for "seaweeds, if manufactured or dyed" it must be so

changed or advanced in condition that the commodity had attained a distinctive name, character, or use different from that originally possessed by the material before being subjected to the manufacturing process. In other words, the court construed the provision "seaweeds, if manufactured or dyed" as if it read "manufactures of seaweeds."

In a subsequent decision, *T. Sumida & Co. (Ltd.)* v. *United States*, 55 Treas. Dec. 21, T. D. 43111, testimony was introduced showing exactly how nori tsukudani was used, namely, that it is a dark, pasty substance resembling in appearance conserve or preserve and is used as an appetizer or condiment. The court held that it was not a prepared vegetable but was a sauce dutiable as such under paragraph 773 of the Tariff Act of 1922 and not dutiable under the provision for "seaweeds, if manufactured or dyed." The merchandise in that case, a sauce, had a different character and use from the nori of which it was made, yet the court did not mention *Ishimitsu* v. *United States, supra,* which contained a definition of "seaweeds, if manufactured or dyed" as an article having a new name, character, or use different from the seaweeds from which it was manufactured.

A different construction of the term "seaweeds, if manufactured or dyed" was adopted in *W. H. & L. D. Betz* v. *United States*, 26 C. C. P. A. (Customs) 399, C. A. D. 46. The court said at page 402:

We do not think it requires extended discussion or citations of authority to support the conclusion that the imported "Norgine F" is neither seaweed in a crude state nor should it be regarded as "seaweeds * * * manufactured," for tariff purposes. *To be either it is essential that it still be seaweed.* A thing may be manufactured from a thing and not be that thing manufactured. Appellant's counsel, at the time of oral argument, was asked as to the applicability of paragraph 1558. His reply was that if the merchandise was a manufactured article at all it was seaweed, manufactured. This reasoning suggests the line of thought that has led appellant's counsel erroneously to argue that because this product is the result of a manufacturing process, it is seaweed, manufactured. We think if the material at bar was not enumerated in the tariff act, it would properly fall within the nonenumerated manufactured provision of paragraph 1558 not as a manufactured seaweed, although it has been manufactured from seaweed, but as a manufactured article regardless of from what it was manufactured. That paragraph 1540 was not intended to apply to every kind of article that could be manufactured from moss, sea grass, eelgrass, and seaweeds, is evidenced, we think, to some extent by the phrase "if manufactured or dyed." It cannot be said that unless the paragraph should be construed to include everything manufactured *from* the articles named there, there will be nothing for the paragraph to operate upon. Without adopting appellant's construction of the controverted paragraph, we can think of many different kinds of manufacturing operations and treatments of the articles named in the paragraph which would permit them to fall within its *eo nomine* provisions and at the same time be manufactured or dyed. [Italics ours except the word "from."]

This court relied upon the authority of the *Betz* case, *supra,* and others of the same nature, in holding in *T. M. Duche & Sons, Inc.* v. *United States*, 8 Cust. Ct. 496, Abstract 47096, that a product called

"Blandola," which was manufactured from seaweeds, was dutiable as a nonenumerated manufactured article under paragraph 1558 of the Tariff Act of 1930 rather than at 10 per centum ad valorem as "seaweeds, if manufactured or dyed" under paragraph 1540, or free of duty as "seaweeds, * * * crude or unmanufactured" under paragraph 1722.

The decision in *Togasaki & Co.* v. *United States*, 12 Ct. Cust. Appls. 463, T. D. 40667, also cited by the defendant, did not involve the classification of the merchandise under the provision for "seaweeds, if manufactured or dyed." The sole claim was that the nori tsukudani therein involved was free of duty as "seaweeds * * * crude or unmanufactured" under paragraph 552 of the Tariff Act of 1913.

The asakusa nori, tokusen ohban nori, and matsu ohban nori herein involved, raise a question in classification which is the reverse of that in the *Betz* and *Duche & Sons* cases, *supra*. Here the seaweed has been advanced merely by the addition of the monosodium glutamate and the cutting thereof into small pieces and has not been changed into a new article having a name, character, or use different from seaweeds, while in those cases a new article having a different name and use was made *from* seaweeds. In the *Betz* case, *supra*, the court described the characteristics of merchandise coming within the provision "seaweeds, if manufactured" to be the same as those of the merchandise in the instant case. We are of opinion that the varieties of seaweeds above mentioned were advanced or manufactured and cannot be regarded as crude or unmanufactured seaweeds which are provided for in paragraph 1722. They are not manufactured into a new article, however, but fall within the provision for "seaweeds, if manufactured or dyed" in paragraph 1540, which, being an *eo nomine* provision, as stated in the *Betz* case, *supra*, is more specific than the general provision for prepared vegetables under paragraph 775. In *Lucciano Rossi* v. *United States*, 68 Treas. Dec. 369, T. D. 47917, affirmed in 24 C. C. P. A. (Customs) 18, T. D. 48290, the court held that dried sliced mushrooms, packed in tins, were dutiable under the provision for "mushrooms, * * * dried" in paragraph 768 of the Tariff Act of 1930, rather than under the provision for "vegetables * * * cut, sliced, * * * or prepared * * * in any other way and not specially provided for," in paragraph 775. The same principle is applicable in this case because the merchandise comes within the specific provision "seaweeds, if manufactured or dyed," whether or not it is prepared vegetables.

We are of opinion that the asakusa nori, tokusen ohban nori, matsu ohban nori, and hoshi nori, which is the same as asakusa nori (the item numbers of which are enumerated in schedule A hereto attached and made a part hereof), are "seaweeds, if manufactured or dyed" and we hold said merchandise to be dutiable at 10 per centum ad

valorem under paragraph 1540, that claim in the protests being sustained and judgment thereon will be entered in favor of the plaintiffs.

No evidence was produced showing how the ajitsuki nori was produced but witness Hoshizaki testified that it is seasoned and prepared and is eaten in the condition in which it comes out of the can. His testimony is corroborated by that of witness Togasaki. We find that the presumption of correctness attaching to the collector's classification of said merchandise has not been overcome and we hold that it is dutiable at 35 per centum ad valorem under paragraph 775 as returned by the collector. As to the ajitsuki nori, judgment will be entered in favor of the defendant.

There remains for consideration the classification of the merchandise invoiced as "konbu" or "kombu," which are two spellings of the same word. Such product is a commodity different from nori and the evidence indicates that it is a kind of seaweed known as "kelp," which is provided for in paragraph 1705 without words of limitation. Therefore, the provision covers all kinds of kelp. Oboro konbu and tororo konbu are made by shaving or scraping kelp, and, according to the testimony of witness Sample, they contain monosodium glutamate, but we are of opinion that such treatments do not make any difference in the classification of kelp. In *Centennial Flouring Mills Co. et al.* v. *United States*, 29 C. C. P. A. (Customs) 264, C. A. D. 200, ground kelp was held to be free of duty under the provision for "kelp" in paragraph 1705. On the authority of that decision, we hold that all of the kelp products (a list of the invoice descriptions being given in schedule B attached hereto and made a part hereof) are free of duty under paragraph 1705 and that claim is therefore sustained. As to said merchandise, judgment will be entered in favor of the plaintiffs.

Protest 990373–G, which does not contain the claim that the oboro kombu covered thereby is free of duty under paragraph 1705, is overruled. The protest contains a claim that the goods are free of duty under paragraph 1722, but the merchandise does not come within the provisions of that paragraph because it is not crude seaweed. The decisions in *United States* v. *American Machine & Metals, Inc.*, 29 C. C. P. A. (Customs) 137, C. A. D. 183, and *United States* v. *Buffalo Natural Gas Fuel Co.*, 172 U. S. 339, cited by the plaintiffs in support of the claim that the protest is sufficient, are not in point. As to the oboro kombu covered by protest 990373–G, judgment will be entered in favor of the defendant.

At the trial in Portland the parties disposed of the claim against the classification of certain fish by stipulating that the merchandise in cases 1440/3, covered by protest 998013–G, invoiced as "Oba Iriko," is of the same character as that passed upon in *Fujii* v. *United States*, 1 Cust. Ct. 475, Abstract 39806, and the record in that case

was incorporated herein. Upon the basis of that stipulation and following the decision in the case cited, we hold said merchandise to be dutiable at 1¼ cents per pound under paragraph 717 (c) of the Tariff Act of 1930, that claim in protest 998013–G being sustained.