(C.D. 2802)

MUTUAL TRADING COMPANY, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 25, 1966)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.

*J. William Doolittle*, Acting Assistant Attorney General (*Glenn E. Harris* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, is described on the invoices as dried laver. It was

imported from Korea and entered at the port of Los Angeles on December 26, 1961, and April 23, 1962.[1] Duty was assessed at 5 per centum ad valorem under paragraph 1540 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, and as amended by Public Law 86–402, T.D. 55107, as seaweed if manufactured or dyed. It is claimed that the merchandise is entitled to free entry under paragraph 1722 of said tariff act, as amended, as seaweed, crude or unmanufactured, or not further manufactured than ground, powdered, or granulated.

The pertinent provisions of said tariff act, as modified and amended, are as follows:

Paragraph 1540, as modified by T.D. 51802 and amended by T.D. 55107:

Moss and sea grass, eelgrass, and seaweeds, if manufac-
tured or dyed (except as provided in paragraph 1722) _ 5% ad val.

Paragraph 1722, as amended by T.D. 55107:

Moss, seaweeds, and vegetable substances, crude or un-
manufactured, not specially provided for; and seaweeds not
further manufactured than ground, powdered, or granu-
lated. [Free]

At the trial, Noritoshi Kanai testified that he has been general manager of Mutual Trading Company, Inc., the plaintiff herein, since January 1963; that the firm is an importer and wholesaler of oriental foods; and that his duties include purchasing, selling, warehouse maintenance, and finance. Prior to that, he was general manager and vice president of Tokyo Mutual Trading Company for 10 years. That firm is an export agent of Mutual Trading Company, Inc. The witness' duties there included finding merchandise for export, visiting manufacturers, purchasing, shipment, and finance. The witness said he has been familiar with the merchandise, described as dried laver on the invoices, since he was born and has handled it commercially since he entered Tokyo Mutual Trading. It is a kind of edible seaweed, called "nori" in Japanese. A sample of such merchandise originating in Korea was received in evidence as plaintiff's exhibit 1. It consists of thin sheets of seaweed material, folded, and packed in a cellophane bag.

Mr. Kanai testified that he had seen dried laver prepared during a period of 10 years in four different places and that the method of preparation is the same. He had never seen it prepared in Korea but stated that the Korean seaweed represented by exhibit 1 does not differ

---

[1] These cases were heard and submitted before Judge Wilson at Los Angeles on March 5, 1965. Plaintiff's brief was filed on January 5, 1966, and defendant's brief on June 21, 1966. The case was submitted before the first division as now constituted on April 19, 1966.

from dried laver from Japan and is used for the same purposes. He described the method of preparation as follows: During January and February, fishermen bring in seaweed picked up from the sea in a wooden tub filled with sea water. The sea water is discarded; the seaweed placed in a wire basket and fresh water is poured on to wash away the salt and sand. Then the seaweed is placed in a shallow tub with water so that the seaweed floats. The seaweed is taken up by means of bamboo blinds or screens having a square wooden frame and hung in the sun to dry. It remains in the sun 6 or 8 hours after which it is taken off like paper, piled in stacks of 100 sheets, and put in a drying room having a small electric heater for 24 hours, at a temperature of 100 to 110 degrees. This removes the moisture completely. Then the sheets are folded into 10-sheet units, called "Jo," and put in cellophane or paper bags. The bags are placed in tin cans to protect the merchandise from moisture, which would make it turn red. The merchandise usually comes in quantities of 160 Jo, which are put in a large tin can. In the instant case, 10 Jo comprised 1 bundle and 64 bundles were packed in a wooden case.

According to the witness, the merchandise is eaten by human beings. It is used for wrapping rice, rolling cooked rice, and sometimes in seaweed soup.

On cross-examination the witness was asked whether the merchandise was produced by the following basic process:

* * * After the seaweed is taken from the sea, it is chopped in pieces, put in tubs of water, removed, and placed on a screen to dry, taken from the screen in sheets, flavored with monosodium glutamate, folded, and packed.

Mr. Kanai replied in the negative, stating that "this dried seaweed is expected to have natural flavor after taste, and Japanese people don't ever use seasoning." He said that a product known as "nori tsukudani" is seaweed seasoned and cooked with soy sauce, sugar, and monosodium glutamate and sealed in a bottle.

The question before the court is whether this merchandise, which was agreed to be seaweed, is manufactured, unmanufactured, or not further manufactured than ground, powdered, or granulated, as those terms are used in paragraphs 1540 and 1722, *supra*.

A number of cases on edible seaweeds have been before the courts. Plaintiff relies upon *United States* v. *Furuya & Co.*, 7 Ct. Cust. Appls. 495, T.D. 37109; *United States* v. *Ohashi Importing Co.*, 7 Ct. Cust. Appls. 487, T.D. 37106; *Geo. S. Bush & Co. (Inc.) et al.* v. *United States*, 36 Treas. Dec. 590, T.D. 38072.

In the *Furuya* case, the merchandise consisted of dried seaweed which had been produced by scooping small leaves by hand from the water, pouring them into boxes about an eighth of an inch deep and

8 inches square, covering with a thin bamboo mat, stacking the boxes and allowing the material to stand in the sun until dry. The seaweed then had the appearance of a thin solid sheet of material. A dozen sheets were folded together and placed in a paper wrapper and the bundles packed into tin boxes. The court held that the merchandise was crude seaweed, stating (p. 497):

* * * No foreign substance has been added to the seaweed; nor has it been processed or prepared in any manner, except by simply placing it in boxes and permitting the water to ooze from it until it became dry. This treatment and the method of packing the article for shipment seem to be nothing more than is necessary in order to get the crude seaweed into the market. If the imported sheets be soaked in water the original leaves or shreds of seaweed will resume their former shapes, and, according to a witness, "you can see all the pieces as it comes from the beach; you can see this same identical thing as is here by going out on the beach." It seems clear that a process which does not change the character of the seaweed in any particular, but simply dries it for the purpose of packing and transporting it in boxes like those above described, does not withdraw the article from the favor of the free-entry paragraph.

In the *Ohashi* case, the only question was whether the importation was natural dried seaweed. The court said (p. 488):

* * * That the importation is seaweed is not questioned; that it is dried is apparent from an inspection of the samples and from its expanding to natural form when soaked in water; that it is not treated otherwise is apparent from the testimony * * *.

The witness testified that he could tell by appearance and taste if the seaweed had been sun dried or treated with shoyu and that the imported merchandise had not been treated or cooked.

Similar merchandise was involved in the *Bush* case except that the larger leaves had been reduced in size by breaking or cutting. It was held that that was not sufficient to change the nature or condition of the seaweed so that it was a manufactured article.

These cases were called to the attention of Congress in the Summary of Tariff Information, 1920, page 723, where it is stated:

* * * Seaweeds dried, such as *nori* (7 Ct. Cust. Appls. 487, of 1917, G.A. 8272, T.D. 38072, of 1919) and *hashinori* (7 Ct. Cust. Appls. 495, of 1917), with nothing added to change their character, and packed in tin boxes as a convenient method of getting the products to market, are crude seaweeds, and not by reason of being edible dutiable as vegetables.

In *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T.D. 38963, and *Togasaki & Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 463, T.D. 40667, it was held that a Japanese food product known as "nori tsukudani," consisting of seaweed which had been dried, cooked with

a sauce called shoyu, and canned, was not crude or unmanufactured seaweed; that it was not classifiable as seaweed, manufactured, since it had not been changed into something new, but was classifiable as vegetables, prepared.

In *United States* v. *Nippon Co. et al.*, 32 CCPA 164, C.A.D. 303, it was held that a dried seaweed known as "nori" was classifiable as seaweed, manufactured. The court stated (p. 170):

Without repeating here the various steps which took place in the preparation of the imported article, which the Government contends is so processed as to be ready to be eaten as a vegetable, it is important to consider the fact that the crude seaweed (nori), which is shown to be of a delicate, mossy texture, is cut up, washed, and, while floating in water, dipped out in such a way as to make it, owing to its consistency like "paper pulp," easily compacted and formed into thin, brittle, almost transparent sheets, when dried and treated as above described. Manufacturing processes have been applied to the article in such a way as to wholly destroy its original form and structure and to make it advanced in condition for use as a condiment, or for cooking in various ways, or in some instances, for eating as imported. In order to complete the preparation of the material and to give it proper flavor, somewhere in the process of its preparation, monosodium glutamate was added. Surely these steps must be regarded as manufacturing steps, and such as would remove the material from its crude state, although, under well-settled authority not necessary to repeat here, the material still remains seaweed.

The *Ishimitsu* and *Togasaki* cases were discussed but no mention was made of the *Furuya, Ohashi*, and *Bush* cases, although they were discussed in the opinion of the trial court, *Nippon Co. et al.* v. *United States*, 12 Cust. Ct. 70, C.D. 832. The trial court found they were not applicable on the ground that the merchandise before it had been cut into small pieces and flavored with monosodium glutamate; that the labor performed on the product had changed its structure; and that it was changed from its crude or unmanufactured condition and fell within the provision for seaweeds if manufactured.

In the Summary of Tariff Information, 1929, discussing paragraph 1622 of the 1922 Act, which was the same in material respects as paragraph 1722 of the 1930 Act, it is stated (p. 2454):

* * * Seaweeds are harvested by cutting with a sickle, dragging weighted hooks behind boats, and by diving. * * * Seaweeds are prepared for market by drying in the air in much the same manner as hay.

In the Summaries of Tariff Information, 1948, volume 15, part 7, page 97, it is stated under paragraph 1540 that "specially prepared seaweed for oriental food" is one of the chief imports of seaweed manufactures and that the large increase in imports in 1947 consisted of Japanese style foods made from seaweed. In the same work in volume 16, part 3, page 281, under paragraph 1722, it is stated that

purple laver is one of the seaweeds of commercial importance and that it is used chiefly for foods.

The Government argues that Mr. Kanai's testimony describing the preparation he had seen is of no probative value and should not be considered by the court in reaching its decision herein. This would leave the court without any helpful testimony on the protest issue. Mr. Kanai admitted the merchandise was of Korean origin, and he had not seen it or similar merchandise prepared there. But he had dealt in both Korean and Japanese seaweed for many years and had seen it prepared many times in Japan. The Korean and the Japanese "laver" seaweed were the same and had the same uses. Obviously his testimony fails as direct testimony. The witness, we hold, was giving his *opinion* as to how the merchandise was produced in Korea, based on his *knowledge* of how merchandise, the same in all respects, was produced in Japan, and his having dealt in such merchandise, the product of both countries, for so long. This is our inference from the whole tenor of his testimony. The witness' weakness in English apparently prevented the orderly development of his opinions and their distinct separation from fact, such as might have been required of an educated witness who used English as his native tongue. We do not think such irregularity as there may have been prevents us from making use of this relevant testimony from a manifestly knowledgeable source. The hearing judge was lenient, and so should we be, too. Having the trade background that he had, it was not vital that Mr. Kanai actually have seen the seaweed being gathered and processed in either country. Courts have often admitted trade testimony as to manufacturing processes not based on direct firsthand knowledge of the production of the imported goods subject to protest. *Hirschberg et al.* v. *United States*, 7 Ct. Cust. Appls. 40, T.D. 36307; *Great Lakes Paper Company et al.* v. *United States*, 52 Cust. Ct. 64, C.D. 2438; *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 57 Cust. Ct. —, C.D. 2718; *Pistorino & Co., Inc.* v. *United States*, 42 Cust. Ct. 384, Abstract 63080.

In the *Tower* case, Rao, C. J., said:

Although this witness had not seen production procedures of the Canadian manufacturer of the merchandise at bar, he had seen similar articles manufactured by the Screw & Bolt Corp. of America in Pittsburgh, Pa. They were made with * * *.

In the *Pistorino* case, the issue was whether imported silk waste had been degummed before importation other than in the reeling process. Since concededly it was partly degummed, the issue narrowed to whether this had occurred during the reeling, or otherwise. Seven witnesses testified as to this, from visual inspection, feel, and smell. None purported to have seen it produced or to have any direct knowl-

edge with respect thereto. As to one entry, all seven agreed it was not degummed other than in the reeling process, and as to that entry, the court sustained the protest. As to the others, the witnesses disagreed. The second division said that in view of the lack of unanimity, the presumption of correctness of the collector's classification was not overcome, though, as it said, it might have reached a different conclusion if it had been given evidence as to the actual process utilized by the exporter.

This would seem to mean that, when a process performed in a foreign country is determinative of a tariff classification, a knowledgeable trade witness may give his opinion of what the process was, based on appearance, composition, smell, etc. Direct testimony of what the process was has more weight and is preferable but may not always be available. Here, the testimony may not be weighty but it is uncontradicted and is all that was offered. The hearing judge apparently thought it was competent. Failure to adduce opinion testimony where trade secrecy made direct testimony unavailable has led to the court being practically unable to classify imported merchandise, as in *I. Magnin & Co. et al.* v. *United States*, 30 Cust. Ct. 309, Abstract 57011; *W. A. Cleary Corp* v. *United States*, 18 Cust. Ct. 145, Abstract 51524. It should not be put in the power of secretive foreigners to frustrate the inquiries of this court when such a miscarriage can be avoided. True, plaintiff was not required to make, and made no showing here that direct testimony was unavailable. Still, we do not think the hearing judge (Wilson) committed error in overruling such objection to Mr. Kanai's testimony as was interposed, nor do we agree with the Government's claim (for which it cites no authority) that the testimony proves nothing as to processes; no doubt it would have been of slight weight if contradicted by direct testimony.

It seems reasonable to suppose that operations performed before importation normally leave evidences in the imported product that are apparent to a qualified trade witness. Therefore, if it closely resembles, in his eyes, another product with whose method of production he is personally familiar, he may well infer, and testify, that both were made in the same way. At times, it is true, differences in mode of production that have tariff significance may furnish no traces in the condition of the merchandise as imported. Regrettably, no one, then, can properly classify the merchandise just by examining it. Such instances have to be the exception and not the rule. If adversary counsel suspects that such a situation may occur in the merchandise in litigation, he can develop his suspicion by cross-examination, rebuttal testimony, or otherwise. He cannot arbitrarily deny the propriety of such inferences as traders normally draw when their own financial

welfare is at stake. It is common knowledge that, in making business decisions, men deduce the prior history of merchandise from the condition in which they find it. Thus a wine taster, it is said, can tell by taste the year of a wine and the vineyard from which it comes.

The court in chambers has placed a portion of exhibit 1 in water overnight. It was observed to expand somewhat, and to resemble much more closely natural seaweed such as is familiar in United States waters. It became slimy to the touch as objects do which have been submerged in sea water. The water in which it floated assumed a pinkish tinge. The court, therefore, considers that exhibit 1, to a degree, corroborates Mr. Kanai's testimony and confirms that the differences, if any, between Japanese and Korean dried laver are not material to this litigation.

Treating the Kanai testimony and the exhibit, then, as establishing inferentially the processing the instant merchandise underwent before importation, it consisted of no more than drying and packing. Cases, some called to the attention of the Congress and ratified by it, establish that drying and packing did not in a tariff sense advance seaweed beyond the crude state. We note in this case the additional or supplemental drying in a drying room. Apparently in earlier cases the only drying agent was the sun. However, the temperature of the room was 100 to 110 degrees which, if degrees Farenheit were meant, appears too low a temperature to cook the seaweed. We are compelled to suppose the witness meant degrees Farenheit as he testified in English and does business in Los Angeles, Calif. The culinary uses of the imports, with rice and in soup, are among those of the *Ohashi* case, *supra*. Thus the evidence plaintiff introduced suffices to bring the merchandise before us within the congressionally ratified decisions and outside the *Nippon Co.* decision.

Both sides discuss the amendment to paragraphs 1722 and 1540 by Public Law 86–402, which placed seaweed, not further manufactured than ground, powdered, or granulated on the free list in paragraph 1722. Plaintiff raises but does not answer the question whether this overrules the *Nippon Co.* case. Defendant says no, because the intent was to exempt only the processes of grinding, etc., that were named. It would seem any process normally preceding and preparatory to grinding, etc., would also be exempted, whether or not previously considered a manufacture. However, because the *Nippon* case, *supra*, does not bear on the instant litigation, we do not have to decide where it stands under the amendment. To say the least, the amendment does not help defendant, but plaintiff neither in testimony nor in its brief sought to develop facts to bring this case within its intent. Our decision is not based upon it.

For the reasons stated, we hold that the merchandise involved herein is entitled to free entry under paragraph 1722 of the Tariff Act of 1930, as amended, as seaweed, crude or unmanufactured.

The protests are sustained and judgment will be rendered for the plaintiff.